24-972-cv
*Chislett v. N.Y.C. Dep't of Educ.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2024

Argued: April 4, 2025
Decided: September 25, 2025

No. 24-972-cv

———————————————————

LESLIE CHISLETT,
*Plaintiff-Appellant,*


*v.*

NEW YORK CITY DEPARTMENT OF EDUCATION, RICHARD CARRANZA AS
CHANCELLOR OF NEW YORK CITY DEPARTMENT OF EDUCATION, INDIVIDUALLY,
*Defendants-Appellees.*


———————————————————

Before:      LEVAL, BIANCO, and NARDINI, *Circuit Judges.*

Plaintiff Leslie Chislett appeals from the grant of summary judgment by the United States District Court for the Southern District of New York (Rochon, *J.*) in favor of Defendants New York City Department of Education and Richard Carranza. Chislett, who is Caucasian, brought a 42 U.S.C. § 1983 claim of racial discrimination under three theories: (1) she was demoted pursuant to a municipal policy that made race a determinative factor in employment decisions; (2) she suffered a hostile work environment fostered by mandatory implicit bias trainings; and (3) she was constructively discharged. The district court rejected all three theories, largely on the basis that Plaintiff failed to demonstrate the existence of a municipal policy linked to the demotion, hostile work environment, and

constructive discharge. We conclude that the district court did not err in granting summary judgment on Plaintiff's demotion and constructive discharge claims. However, we hold that genuine disputes of material fact precluded the grant of summary judgment on Plaintiff's hostile work environment claim. We therefore AFFIRM in part, VACATE in part, and REMAND.

BRIAN HELLER (Davida S. Perry, *on the brief*), Schwartz Perry & Heller LLP, New York, NY, *for Plaintiff-Appellant*.

LAUREN L. O'BRIEN (Richard Dearing and Jamison Davies, *on the brief*), *for* Muriel Goode-Trufant, Acting Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellees*.

LEVAL, *Circuit Judge*:

Plaintiff Leslie Chislett appeals from the grant of summary judgment by the United States District Court for the Southern District of New York (Rochon, *J.*) in favor of Defendants New York City Department of Education ("DOE") and Richard Carranza (collectively, "Defendants"). Chislett, who is Caucasian, brought a 42 U.S.C. § 1983 claim of racial discrimination based on three theories: (1) she was demoted pursuant to a municipal policy that made race a determinative factor in employment decisions; (2) she suffered a hostile work environment fostered by mandatory implicit bias trainings; and (3) she was constructively discharged. The district court rejected all three theories, largely on

2

the basis that Plaintiff failed to demonstrate the existence of a municipal policy linked to the demotion, hostile work environment, and constructive discharge.

We conclude that the district court did not err in granting summary judgment on Plaintiff's demotion and constructive discharge claims. However, we hold that genuine disputes of material fact precluded the grant of summary judgment on Plaintiff's hostile work environment claim. We therefore AFFIRM in part, VACATE in part, and REMAND.

## BACKGROUND

### I. Facts

As required in reviewing a grant of summary judgment, although Defendants dispute much of the evidence summarized below, we construe the evidence in the light most favorable to the non-moving party, here Chislett. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 96 (2d Cir. 2010).

Chislett is an educator who worked at the DOE. In 2017, she was asked to serve as the Executive Director of the "AP for All" program, an initiative of former Mayor Bill de Blasio to increase participation in Advance Placement

3

courses by students in "underserved communities." App'x at 1421. "AP for All" was housed in the DOE's Office of Equity & Access ("OEA").

In her role, Chislett supervised fifteen employees and achieved success in expanding access to AP courses. However, there was early racial tension on her team. One subordinate, Akua Adefope, whom Plaintiff had criticized for "poor performance," reported her to the DOE's Office of Equal Opportunity and Diversity Management ("OEO") and accused her of "'microaggressions' toward people of color, such as ignoring, dismissing, avoiding, interrupting, and belittling them." App'x at 64–65; App'x at 413. The OEO found that although Chislett's comments did not rise to the level of discrimination, some of her statements were "inappropriate." App'x at 75. Several of Chislett's subordinates also denounced her for allegedly "holding employees of color back," and when she objected, she was "accused" of being "'white and fragile.'" App'x at 145. Chislett complained to the head of the OEA but was "scolded." App'x at 145.

According to Chislett, racial conflict escalated when de Blasio selected Carranza as Chancellor of the DOE in 2018. Carranza implemented an "equity agenda" to tackle racial and economic disparities among students in their access

to privileges within the school system. App'x at 201. At the time, Carranza stressed the importance of his equity agenda, reportedly stating: "If you draw a paycheck from the DOE, you will either get on board with my equity platform or leave." App'x at 2077.

Both de Blasio and Carranza were intent on promoting racial diversity within the DOE. To this point, de Blasio was reportedly "fixated" on the diversity of candidates, and Carranza declared there was "no daylight" between their approaches. App'x at 1306; App'x at 201. After becoming Chancellor, Carranza created nine Executive Superintendent roles. Seven of the nine roles were filled by Black employees. Additionally, Meisha Ross-Porter, one of the new Executive Superintendents and the person de Blasio later selected to succeed Carranza as Chancellor, declared: "When I am selecting principals, teachers, or leaders—after we make the list, we look at it and we count: how many women, how many people of color, and *why*. . . . I look at the makeup, and I literally count—and it's OK for us to do that." App'x at 2060.

During his time as Chancellor, Carranza mandated implicit bias trainings among DOE staff.[1] The OEA was allocated $23 million and hired approximately twenty staffers to scale these trainings, which were "part and parcel" and a "'cornerstone'" of Carranza's equity agenda. App'x at 1688; App'x at 2066. Both DOE staff and outside vendors facilitated implicit bias workshops. As a member of the OEA, Chislett was required to participate in the trainings, which she claims "exacerbated the already racially-charged workplace." Appellant's Br. at 13. Some of the trainings Chislett attended were part of the DOE's formal implicit bias training initiative. Some were sponsored by specific DOE departments.[2]

During the first bias training on May 4, 2018, the instructor told participants that "white colleagues must take a step back and yield to colleagues

---

[1] Bias trainings predated Carranza's tenure as Chancellor. However, Chislett reported that while aspects of those trainings pre-Carranza made her "uncomfortable," "they were really about equity" and "seemed more generic." App'x at 375.

[2] At oral argument, counsel for Defendants stated: "I don't think it's always entirely clear which trainings were technically implicit bias trainings versus internally planned trainings that were separate from the implicit bias trainings . . . ." Oral Arg. Audio Recording at 19:30–19:42.

of color" and "recognize that values of [w]hite culture are supremacist." App'x at 137–38. At the session, LaShawn Robinson, who led the OEA and would soon be promoted to Deputy Chancellor, told an employee, "We've all taken on whiteness." App'x at 138. The training also included PowerPoint slides that described the traits of "internalized white superiority," including "individualism;" "denial;" "dominating space;" and "intellectualization." App'x at 138.

On May 10, 2018, OEA employees attended an overnight retreat that included additional training. Speakers stated that "white culture's values" are "homogenous and supremacist" as well as that the "Protestant work ethic" and "devotion to the written word" are examples of "white supremacy." App'x at 138. Once again, PowerPoint slides listed values associated with "white supremacy culture," including "Perfectionism;" "Sense of Urgency;" "Paternalism;" "Defensiveness;" "Individualism;" "Either/or thinking;" "Objectivity;" and "Power Hoarding." App'x at 216; *see also* App'x at 139. During a Q&A session, instructors told Chislett that her "interest in excellence was perfectionism and consistent with white supremacy." App'x at 138–39.

At another mandatory training on June 21, 2018, instructors wrote aspects of "white culture" on four posters, including "Entitlement – access to everything;" "Need to feel validated in feelings;" and "Privilege to establish norms/'set the bar.'" App'x at 141; App'x at 218. Another poster was labeled, "The Haves . . . of white culture," and included traits such as "Individualistic;" "Privilege;" "Money;" and "Single Identity." App'x at 221. Dr. Ruby Ababio-Fernandez, who developed the implicit bias initiative and became the OEA's Senior Executive Director, declared: "There is white toxicity in the air, and we all breathe it in." App'x at 141. Participants were instructed to answer questions about themselves that would grade them on a scale of 0 to 130 "according to [their] white privilege like being able to buy products for [their] hair type at a typical drug store" and were physically "lined up to reveal the dividing 'color line of privileges that favored whites.'" App'x at 141.

On day two of the training, participants were asked to break into small groups and list "white values" on a poster. App'x at 142. Chislett felt uncomfortable and opted not to participate. In response, another participant told Chislett that she was a "horrible person" who "did not deserve to be working

with children in New York City." App'x at 142. Additionally, one of the facilitators told participants that if they did not learn to stand up to "people like [Chislett] who disagree with these views about white supremacist values, children's lives would be at stake." App'x at 142. In no instance did a supervisor intervene.

After the implicit bias trainings, racial tensions simmered. On September 17, 2018, when Chislett asked a subordinate, Deonca Renee, why she was late to a meeting that she was supposed to help lead, Renee purportedly answered that Chislett was making a "race-based judgment" and could "not be trusted." App'x at 146. In a meeting the following week, Renee referred to the previous incident and said to Chislett: "How dare you approach me out of your white privilege!" App'x at 146. Chislett complained to her supervisors but did not receive support. In a meeting on November 6, 2018, Chislett's subordinate Adefope told her that she was "racist." App'x at 147. Around the same time, Adefope and Renee told Chislett that "race is at the center of every conversation" they had with her. App'x at 147. At one point, Chislett told her team that "this is becoming almost unbearable for me because there is increasing hostility." App'x at 452. In

response, Renee stated: "How dare you use the word unbearable, there is black people dying in the street, you don't have the right to use that term. You're coming from the position of white privilege and white supremacy." App'x at 452. Chislett again complained, but her supervisors did not intervene.

Content from the trainings also spilled over into workplace interactions. OEA employees directed terminology from the trainings at Chislett, for example telling her that she was "socialized as a white person to be defensive." App'x at 445. In conversations, Chislett's subordinates frequently spoke of the stereotypical "presumed values" of Caucasians, a perception frequently expressed in the training sessions. App'x at 470.

OEA employees were expected to have racial conversations in group settings approximately once a month. At an internal meeting on September 24, 2018, Shannon Maltovsky, Senior Director of Anti-Bias and School Support, shared PowerPoint slides listing ground rules for the office as they began to have "more conversations about race." App'x at 450. Chislett described the rules as explaining that "whites who wanted to withdraw or not participate in order to

10

be safe were demonstrating white fragility, and it was no longer [the] right [of white people] to be safe in the workplace." App'x at 450.

Several of Chislett's Caucasian coworkers began to perceive the environment as hostile. One employee repeatedly stated that the workplace conduct was "unlawful." App'x at 453. In a declaration, another employee described the "open hostility against Caucasian employees within the ranks of the DOE." App'x at 2091. Chislett and a coworker tried to meet with Ababio-Fernandez to discuss their concerns. However, Ababio-Fernandez "invited the very individuals" Chislett and her colleague hoped to discuss. App'x at 147.

On November 30, 2018, Ababio-Fernandez assigned Chislett a leadership coach, OEA Senior Strategy and Policy Advisor Courtney Winkfield, who is also Caucasian. Winkfield offered Chislett insight into "what it means to be a white leader leading staff members of color." App'x at 1867. During a training on February 12, 2019, the facilitator told participants:

> It's going to feel a little bit more uncomfortable when we get to inclusion because I'm going to ask you to talk about your power and your privilege. You are going to have to name that you have privilege. And then I'm going to ask you, while naming your privilege, to acknowledge that you may have to step back from

11

some things, and that's not going to feel good. *And you're probably going to question your job security*. You're probably going to wonder how you feel you belong right now.

App'x at 150 (emphasis added).

DOE employees made racist statements about a colleague of partially white parentage. In February 2019, Chislett heard Renee use racialized sentiments when discussing a "white adjacent" colleague "from a mixed race family" who "adopted [B]lack daughters" and married "a white man." App'x at 471–72. After the colleague attempted to monitor Renee's productivity, Renee called her "a slave master," and another employee labeled her "a white dominant leader." App'x at 472. Chislett complained about what she heard to Ababio-Fernandez and the Senior Director of Operations Shahzad Kazi, but they did not address her complaints.

On March 20, 2019, Ababio-Fernandez and Winkfield removed Chislett's supervisory responsibilities although her title and pay remained the same. They told Chislett that the team needed "time to heal." App'x at 152. The decision was allegedly based on feedback from Chislett's team and other employees who reported that Chislett was an ineffective leader who caused "chaos" and "a

12

negative work environment." App'x at 1896. Within two days, many of Chislett's duties were transferred to Adefope, her subordinate.

On April 3, 2019, Chislett complained to Ababio-Fernandez and Winkfield that meetings had become racially divisive. Kazi then stated: "I too am concerned about the tone of these conversations about race during team meetings. We need to make sure that we do not violate [the] Chancellor's Regulations or Union policy during OEA trainings." App'x at 106. In response, OEA Executive Director of Educational Equity, Anti-Bias and Diversity Paul Forbes declared: "I am not concerned . . . because this Chancellor truly has our back." App'x at 153.

On April 11, 2019, Chislett retained legal counsel who contacted the DOE about her "unanswered complaints regarding the hostile work environment she was forced to endure and the discriminatory manner in which . . . her role had been diminished . . . ." App'x at 106. The DOE "did not take any steps to address Chislett's complaint." App'x at 107.

On April 16, 2019, Winkfield announced that the "AP for All" team would engage in eight weeks of "racial literacy training." App'x at 154. Several weeks later, Chislett complained to Winkfield about a particular assigned reading,

13

which she felt "stereotyped Caucasians." App'x at 154. Chislett also reported that she had to "endure a colleague's offensive race-based accusations" during the trainings that her "lack of vulnerability in conversations was because [she was] white." App'x at 154. Winkfield told Chislett that it was her "responsibility to ask people to stay in protocol" and stated that the "trainings [were] not going to change." App'x at 154.

Around this time, several Caucasian DOE employees contacted the *New York Post* about Carranza's equity agenda. A reporter reached out to Chislett, who spoke anonymously about the implicit bias trainings. However, Chislett's supervisors were aware that she had spoken to the press because the *New York Post* reached out to the DOE to confirm her title. On May 18, 2019, the *New York Post* published an article titled "Schools Chancellor Richard Carranza accused of demoting admins because they were white." App'x at 259–62. Two days later, the *New York Post* published another article titled "Richard Carranza held 'white supremacy culture' training for school admins," which contained a picture that Chislett took during an implicit bias training. App'x at 264–66.

On May 23, 2019, Chislett attended an OEA staff training retreat.

Conversation quickly turned to the *New York Post* articles. Forbes declared:

> We see there are people within who already have views and say
> they are part of the equity excellence work and they're sitting
> amongst us, next to us, between us and alongside of whiteness. I
> keep saying, if you go to Tweed [the DOE headquarters], there are
> people there who say they have that title but they are not about
> this, but they don't know what that's about.

App'x at 157. The room became very tense, and Renee stood up. She addressed

Chislett by name and told her that she was "prohibiting this work from

happening." App'x at 157. Adefope stood up and called out Chislett as well.

Other employees also stood up and told Chislett that she was "not willing to do

the [equity] work" and that she "should just go." App'x at 158. This continued

for approximately fifteen minutes before Ababio-Fernandez terminated it.

Chislett "tried to defend herself" and left the meeting "humiliated;"

"frightened;" and "in tears." App'x at 1593; App'x at 158.

Chislett left the retreat before the second day and required short term

disability leave to seek medical attention for her emotional distress. After her

leave, Chislett felt she could not return to the workplace. Consequently, Chislett resigned from the DOE in September 2019.

## II.     The Proceedings Below

On October 1, 2019, Plaintiff initiated this suit in the Supreme Court of New York (New York County). She amended her complaint on October 25, 2021, asserting claims of race discrimination under 42 U.S.C. § 1983 and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq*. On November 22, 2021, Defendants removed the case to the United States District Court for the Southern District of New York. Plaintiff voluntarily dismissed her state law claims on May 4, 2023.

On June 16, 2023, Defendants moved for summary judgment. Defendants asserted that the reasons for Plaintiff's demotion were her inadequate leadership skills and the interpersonal conflict she caused—not race discrimination. They argued that the implicit bias trainings did not create a hostile work environment and that Plaintiff failed to establish the existence of a race-based DOE policy needed for municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). In opposition, Plaintiff argued that the DOE had a

racially discriminatory policy that caused her demotion, created a hostile work environment, and led to her constructive discharge.

The district court granted Defendants' motion for summary judgment on March 14, 2024. The district court ruled that (1) Plaintiff failed to present evidence demonstrating that Defendants' actions were attributable to discrimination; (2) Plaintiff did not present evidence of a municipal race-based policy; and (3) Plaintiff did not demonstrate a causal link between any municipal policy and the demotion, hostile work environment, or constructive discharge. Plaintiff timely appealed.

## DISCUSSION

"We review *de novo* a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could

17

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

"As recent discrimination cases of our court have made clear, summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998).

"Section 1983 allows plaintiffs to sue municipal entities (and municipal officials in their personal capacities) for deprivations of constitutional rights." *Quinones v. City of Binghamton*, 997 F.3d 461, 466 (2d Cir. 2021). "[T]hrough its application of the Equal Protection Clause of the Fourteenth Amendment, [it] protects public employees from various forms of discrimination, including hostile work environment and disparate treatment on the basis of race." *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015) (alteration adopted) (internal quotation marks omitted).

*Monell* provides that a municipality or municipal agency may be liable under § 1983 when its policy or custom causes a constitutional violation.[3] *Monell*, 436 U.S. at 694. "The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). A municipality cannot be held liable on the theory of *respondeat superior*; the plaintiff must establish that the municipality's policy or custom *itself* was a "moving force of the constitutional violation." *Monell*, 436 U.S. at 691, 694. A natural person may be liable under § 1983 only if the official was "personally involved in the alleged deprivation." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004). The issue of causation is for the jury. *See*

---

[3] Defendants argue that it is unclear whether the DOE is a "suable entity;" nevertheless, they "do not press that issue here because Chislett's claims plainly fail for other reasons." Appellees' Br. at 17 n.2. Under *Monell*, state law determines whether the municipal entity or official possessed final policymaking authority with regard to the actions in question and is therefore subject to § 1983 liability. *See McMillian v. Monroe Cnty.*, 520 U.S. 781, 786 (1997). Under New York law, "the city board [of Education] and the Chancellor are responsible for policy having city-wide impact." *N.Y.C. Sch. Bds. Ass'n, Inc. v. Bd. of Ed. of City Sch. Dist. of City of N.Y.*, 347 N.E.2d 568, 573 (N.Y. 1976).

19

*Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) ("[W]hether the relevant conduct of the pertinent policymaking official caused the injury of which the plaintiff complains is a question of fact for the jury.").

"To show a policy, custom, or practice [justifying municipal liability], the plaintiff need not identify an express rule or regulation." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). It suffices to establish that discriminatory practices were "persistent and widespread" so as "to constitute a custom or usage with the force of law" and that a discriminatory practice of subordinates was "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992) (internal quotation marks omitted); *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."). A municipal policy can even consist of "inaction." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("Specifically, *Monell*'s

20

policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.").

Plaintiff argues that the district court erred in granting summary judgment to Defendants because there were genuine disputes of material fact as to whether the DOE had a racially discriminatory municipal policy that caused the (1) demotion; (2) hostile work environment; and (3) constructive discharge. We address each claim in turn.

## I.     Plaintiff's Claim of Demotion

For claims of employment discrimination under § 1983, courts apply the *McDonnell Douglas* framework used in the Title VII context. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (explaining that courts analyze § 1983 claims of employment discrimination under the *McDonnell Douglas* framework).

Under *McDonnell Douglas*, the content of the *prima facie* case changes when the employer discloses its reasons for the adverse employment action. *See*

*Littlejohn*, 795 F.3d at 307 ("[T]he requirements of a prima facie case for a plaintiff alleging employment discrimination change as the case progresses."). Prior to the employer's disclosure, a presumption arises in the plaintiff's favor precluding dismissal for want of a showing of discrimination or causation if the plaintiff points to evidence that (1) "she is a member of a protected class;" (2) "she was qualified for employment in the position;" (3) "she suffered an adverse employment action;" and (4) she has "some minimal evidence suggesting an inference that the employer acted with discriminatory motivation."[4] *Id.* Coupled

---

[4] In *McDonnell Douglas* itself, which was a case involving allegations of racially discriminatory denial of employment, for the fourth factor, the Supreme Court specified that "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas,* 411 U.S. at 802. The Supreme Court more recently ceased to rely on this requirement in Title VII cases, apparently recognizing that it had no application to cases involving other adverse employment actions and furthermore that this factor was not useful. *See Ames v. Ohio Dep't Youth Servs.*, 605 U.S. 303, 309 (2025) (explaining that a plaintiff may establish a *prima facie* case "simply by presenting evidence 'that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.'" (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981))); *see also Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (emphasizing that "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment

with the temporary presumption, such a showing satisfies the *prima facie* case, "shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff." *Id.*

However, once an employer articulates a reason for its actions, the presumption of discrimination "drops from the case," *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 n.10 (1981), and "is no longer relevant," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993). At this point, the plaintiff must produce enough evidence for a jury to find intentional discrimination. *See Burdine*, 450 U.S. at 256 (explaining that the plaintiff's burden of persuasion "now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination"). Additionally, as part of a § 1983 claim (as opposed to a Title VII claim), the plaintiff must demonstrate that discrimination "was a 'but-for' cause of the adverse employment action or the hostile environment." *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019).

---

decision," but rather, "the fourth element set forth in *McDonnell Douglas* is a flexible one that can be satisfied differently in differing factual scenarios").

23

Defendants gave reasons why Chislett's supervisory responsibilities were removed, such that the presumptions supporting the first phase of the *prima facie* case dropped away. Winkfield testified at her deposition that by observing Chislett over a two-to-three-week period and meeting with her team, she found "a pattern of feedback from nearly every member of the team that expressed that they did not believe her to be an effective leader and that they believed that she created chaos and a negative work environment." App'x at 1896. Winkfield further testified that team members felt Chislett "was very inconsistent in the way she enforced rules and policies, that she was overly harsh with some employees and overly accommodating with others" and did not "conduct herself always professionally in small group and team settings." App'x at 1991–92. The "majority of the feedback" that Winkfield received from Chislett's "subordinates and from her colleagues [was] not racial in nature at all." App'x at 1896. Ababio-Fernandez testified that the conflicts between Chislett and her team members "created inefficiencies in [Chislett's] ability to do exactly what she wanted to do" and "interrupted the work." App'x at 1516.

24

Chislett argues that the district court "shifted the burden on summary judgment" by requiring her to "disprove Winkfield's assertions." Appellant's Br. at 45–46. However, the "final and ultimate burden is on the plaintiff" to establish that discrimination was the cause of the adverse action. *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014).[5] Chislett did not meet this burden. She failed to produce evidence that the persons responsible for the decision to

---

[5] Decisions on this issue often say that the defendant gave "legitimate, non-discriminatory" reasons for the adverse employment action. *See, e.g.*, *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). The burden on the defendant at this point, however, does not require that it give "legitimate" reasons for its action. What matters is whether the adverse action was attributable to the discrimination alleged by the plaintiff. For example, if a defendant fired a plaintiff because an executive at the company had accepted a bribe to fire the plaintiff so that the payer of the bribe could get her position, that reason, although not "legitimate," would nonetheless satisfy the defendant's burden of giving the reason for which it took the adverse action. *See Hicks*, 509 U.S. at 509 (explaining that the defendant's burden of production is to "introduce evidence which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action"). Upon the defendant's giving of such a reason, the presumptions usually supporting the *prima facie* case would drop away, and the plaintiff would bear the burden of proving that the adverse action was taken because of the alleged discrimination.

25

remove her supervisory responsibilities were motivated by racial

discrimination.[6]

     Plaintiff contends that (1) there was no support for Winkfield's assertions

beyond Winkfield's own testimony; (2) Winkfield never told her about the

complaints; and (3) Chislett's "positive relationships with many of her

colleagues" refute Winkfield's claims.[7] Appellant's Br. at 45. These arguments

fail. It was Chislett's burden to prove that her deprivation of responsibilities was

---

[6] Even if some of the adverse evaluations Winkfield received from Chislett's team members were influenced by racial bias, Winkfield also received feedback adverse to Chislett from persons outside the team. Plaintiff gave no evidence that Winkfield either acted out of a racial bias or should have known that the negative evaluations of the persons she canvassed from outside the team were in any way influenced by anti-white bias.

[7] Chislett also claims that Winkfield's testimony is based on inadmissible hearsay (i.e., the complaints of DOE employees). Plaintiff did not raise this argument in her opening brief, rendering it forfeited. *Browe v. CTC Corp.*, 15 F.4th 175, 191 (2d Cir. 2021). Nevertheless, this argument fails on the merits. Negative evaluations by DOE employees were admissible as non-hearsay not for the truth of what they stated (i.e., that Chislett was an ineffective leader) but rather for their effect on Winkfield, giving her reason to believe that Chislett was an ineffective leader. *See, e.g.*, *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (explaining that in a discrimination case, "we are decidedly not interested in the truth of the allegations against plaintiff" but instead care about what motivated the employer).

discriminatory. She failed to refute Winkfield's testimony that she had received

so many negative evaluations.

We find no error in the district court's grant of summary judgment to

Defendants on Chislett's claim that her demotion was by reason of race bias.

## II.    Chislett's Claim of Hostile Work Environment

"A custom or policy of harassment and other discriminatory acts giving

rise to hostile work environment claims can form the basis of section 1983

claims." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014). A

plaintiff must show more than occasional hostile comments of co-workers. The

conduct must be "sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted). In

doing so, the plaintiff "must demonstrate either that a single incident was

extraordinarily severe, or that a series of incidents were sufficiently continuous

and concerted to have altered the conditions of her working environment."

*Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks

omitted). Additionally, the plaintiff must establish that the hostile work

27

environment was due to her protected characteristic. *Brown v. Henderson*, 257

F.3d 246, 252 (2d Cir. 2001).

The test for a hostile work environment involves "both objective and

subjective components: the conduct complained of must be severe or pervasive

enough that a reasonable person would find it hostile or abusive, and the victim

must subjectively perceive the work environment to be abusive." *Raspardo v.*

*Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). Courts deploy a "totality of the

circumstances" analysis in determining whether the work environment was

hostile. *Littlejohn*, 795 F.3d at 321.

For hostile work environment claims, "the plaintiff must demonstrate a

specific basis for imputing the conduct creating the hostile work environment to

the employer." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004). When "the

alleged harasser is in a supervisory position over the plaintiff, the objectionable

conduct is automatically imputed to the employer." *Gorzynski*, 596 F.3d at 103. In

contrast, when a plaintiff's coworkers or non-employees perpetuate the

harassment, the employer will ordinarily not be liable unless the plaintiff

demonstrates that "the employer either provided no reasonable avenue for

complaint or knew of the harassment but did nothing about it." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir. 1992); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (adopting the same standard for harassment perpetuated by non-employees). Further, if the plaintiff sues a municipal agency under § 1983, she must "prove that the hostile work environment she complained of was the product of a [municipal] 'policy or custom.'" *Legg v. Ulster Cnty.*, 979 F.3d 101, 111 n.5 (2d Cir. 2020) (quoting *Monell*, 436 U.S. at 694).

The district court did not determine whether Chislett established a genuine dispute of material fact about whether she experienced a hostile work environment; instead, the district court held that any such environment could not be attributed to a DOE policy. We disagree. Viewing the "totality of the circumstances," *Littlejohn*, 795 F.3d at 321, Chislett raised genuine disputes of material fact about whether the workplace was racially hostile and whether such hostility was the product of a municipal policy. "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee,

the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson*, 375 F.3d at 227.

### A.  Hostile Work Environment Incidents

Because the parties do not dispute that Chislett subjectively perceived the environment as hostile, we focus only on the objective prong of the hostile work environment test. *See Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999). Drawing all reasonable inferences in Plaintiff's favor, a rational juror could find that discriminatory conduct at the DOE was sufficiently severe and pervasive to have created a hostile work environment. There is no "threshold magic number of harassing incidents," *id.* at 439 (internal quotation marks omitted), and Chislett set forth sufficient evidence for a rational juror to find that she was repeatedly exposed to racial harassment at her workplace throughout 2018 and 2019.

First, Chislett presented evidence from which a rational jury could find that racist comments were expressed during bias trainings. For example, instructors mentioned several times that the "values of [w]hite culture are supremacist." App'x at 137–38. Similarly, during one training session, Ababio-

Fernandez, Senior Executive Director of the OEA, declared: "There is white toxicity in the air, and we all breathe it in." App'x at 141. In the sessions, there was persistent messaging to the effect that white culture is generally "[d]efensive[];" "[e]ntitle[d];" "[p]aternalis[tic];" "[p]ower [h]oard[ers];" and "[p]rivilege[d]." App'x at 139; App'x at 141; App'x at 216; App'x at 221. Further, there was physical segregation of white employees and singling out of staff by race during one training session as participants were ordered as to racial privilege associated with whiteness and physically "lined up to reveal the dividing 'color line of privileges that favored whites.'" App'x at 141. Negative generalizations and stereotypes about white people were also targeted specifically at Chislett during the trainings. For instance, during a Q&A session, instructors told Chislett that her "interest in excellence was perfectionism and consistent with white supremacy." App'x at 138–39. On the question of the objectivity of considering the training environment hostile and abusive, it is pertinent that one of Chislett's co-workers was similarly upset about the racial

31

generalizations and that another regarded the DOE as "an extremely hostile environment for white individuals."[8] App'x at 2090.

In addition, a reasonable juror could find from the evidence in the record that there were racialized comments expressed outside the trainings. As a spillover from the trainings, conversations took on a racialized tone, and OEA employees directed terminology from the trainings at Chislett. When Chislett disciplined or managed subordinates, she was allegedly called racist[9] and labeled "white and fragile." App'x at 145. Far from being "episodic" or isolated, these

_____

[8] Defendants argue that many of the identified statements should not form the basis of a hostile work environment claim because they occurred "in the context of discussions about combatting discrimination." Appellees' Br. at 30. We reject the argument. The fact that the purpose of the sessions was to combat race discrimination does not excuse the alleged presence of race discrimination in the conduct of the sessions.

[9] We do not suggest that calling someone racist by itself constitutes racial discrimination or forms the basis of a hostile work environment claim. *See Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) ("'Racism' is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race."). However, in the context of the profusion of remarks attributing numerous detrimental qualities to whiteness (including a sense of racial supremacy), there is at least a question of fact as to whether accusations that Chislett was "racist" were intended as identifying and disparaging a feature of her whiteness.

32

alleged comments were continuous and concentrated, especially given the frequency of the OEA's racial conversations. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997). Construing the evidence most favorably to Chislett, a rational juror could find that there was a consistent "pattern" wherein Chislett "could expect [racist] remarks and other harassment at any time." *Gorzynski*, 596 F.3d at 103.

For example, at an internal meeting on September 17, 2018, when Chislett asked her Black subordinate Renee why she was late to a meeting she was supposed to help lead (a question appropriately put by a supervisor to a subordinate), Renee told Chislett she was making a "race-based judgment" and could "not be trusted." App'x at 146. The following week, Renee referred to the previous incident and admonished Chislett: "How dare you approach me out of your white privilege!" App'x at 146. In or around November 2018, two Black subordinate employees on Chislett's team told her that "race is at the center of every conversation" they had with her. App'x at 147. Further, at one point, Chislett told her team that "this is becoming almost unbearable for me because there is increasing hostility." App'x at 452. In response, Renee stated: "How dare

33

you use the word unbearable, there is black people dying in the street, you don't have the right to use that term. You're coming from the position of white privilege and white supremacy." App'x at 452. The presence of such racialized conflicts and the frequent accusations that Chislett was operating out of white privilege and supremacy for performing ordinary supervisory responsibilities further support her hostile work environment claim.

Third, Chislett presented evidence of comments expressed to another DOE employee of partially white parentage that a reasonable juror could find racially discriminatory. For instance, in February 2019, Chislett heard Renee use racialized sentiments when discussing a "white adjacent" colleague "from a mixed race family" who "adopted [B]lack daughters" and married "a white man." App'x at 471–72. After the colleague attempted to monitor Renee's productivity, Renee called her "a slave master," and another employee labeled her a "white dominant leader." App'x at 472. While not directed at Chislett, these statements are pertinent for several reasons. First, discriminatory "conduct not directly targeted at or spoken to an individual but purposefully taking place in [her] presence can nevertheless transform [her] work environment into a hostile

34

or abusive one." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 389 (2d Cir. 2020); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ("Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."). Furthermore, such discriminatory conduct by the same individual who directed similar conduct at a plaintiff may confirm the objective reasonableness of the plaintiff's perception of the conduct directed at her as racially discriminatory. Such conduct also tends to confirm that supervisory personnel are aware of and tolerate the alleged racial harassment, providing evidence of a municipal policy or custom of complicity.

From this "mosaic" of evidence, a rational juror could find that Chislett experienced a racially hostile work environment. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (internal quotation marks omitted). Collectively, Chislett presented evidence of racially-charged statements expressed during trainings, in meetings, and about another employee in her presence, creating a genuine dispute of material fact about whether the

35

workplace was racially hostile. As such, "whether the conduct taken together created a work environment that was sufficiently hostile to violate [§ 1983] is a question of fact for the jury." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014).

For her hostile work environment claim to be actionable, Chislett must impute the underlying conduct to her employer by demonstrating that Defendants "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Kotcher*, 957 F.2d at 63.[10] Here, a reasonable juror could find that Defendants knew about the racialized harassment but consistently failed to intervene. There is ample evidence that from Spring 2018 on, Chislett reported problems to her superiors and had legal counsel reach out on her behalf in 2019, but no intervention was undertaken (except for appointing Winkfield as Chislett's coach).When Chislett spoke out, her superiors allegedly tolerated the racist behavior she complained of; dismissed her concerns; scolded

---

[10] To the extent that the alleged racist comments of Chislett's supervisors engendered the DOE's hostile work environment, such conduct is automatically imputed to Defendants. *See Gorzynski*, 596 F.3d at 103.

her; told her the trainings were not going to change; put on her the onus of stopping the harassment; or explained they were not concerned because "this Chancellor truly has our back." App'x at 153. We have previously held that evidence that supervisors were aware of a plaintiff's experience of harassment but failed to intervene sufficed to establish genuine disputes of material fact as to imputation. *See Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 71 (2d Cir. 2023); *Feingold*, 366 F.3d at 152. Here too, a reasonable juror could find that Chislett's supervisors knew about the racial harassment Chislett suffered but did nothing to stop it, satisfying the imputation requirement for her hostile work environment claim.

### B.    Municipal Policy

Because Chislett is suing a municipal agency under § 1983, she must show that the hostile work environment was attributable to a municipal policy or custom. *See Legg*, 979 F.3d at 111 n.5.[11] Defendants argue that Chislett failed to

---

[11] The district court held that Chislett failed to link a municipal policy to the harassment she experienced. To this point, the district court stressed that the municipal policy Chislett alleged "focused on race in *employment decisions*" and was not connected "with Carranza's purported focus on providing implicit-bias

37

raise a genuine dispute of material fact as to whether the purportedly hostile

work environment was attributable to a municipal policy. We conclude that

Chislett established a genuine dispute of material fact on the question. She

presented evidence that would allow a reasonable juror to find that the DOE

consistently ignored racial harassment of Caucasian employees in trainings and

workplace interactions, "support[ing] the inference that policymakers, at the

very least, had a custom or practice of acquiescing to [such racial] misconduct."

*Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020).

We do not suggest that the conduct of implicit bias trainings is per se

racist. *See Vavra v. Honeywell Int'l Inc.*, 688 F. Supp. 3d 758, 770 (N.D. Ill. 2023)

(holding that an employer's requirement that employees attend implicit bias

training does not, by itself, violate Title VII) (collecting cases), *aff'd*, 106 F.4th 702

---

trainings for Department employees." *Chislett v. N.Y.C. Dep't of Educ.*, 723 F.
Supp. 3d 285, 299 (S.D.N.Y. 2024). We disagree. Chislett argued that the "DOE's
focus on race also manifested in trainings on 'implicit bias' for DOE employees"
and that the "trainings were a direct offshoot of the Chancellor's priorities."
Chislett Memorandum of Law in Opposition to Motion, ECF No. 52, at 14–15.
Further, as explained above, we hold that Chislett raised a genuine dispute of
material fact regarding whether the DOE had a policy of inaction with regard to
such racial harassment based on whiteness.

(7th Cir. 2024). What matters here is the way the trainings were conducted. When employment trainings discuss any race "with a constant drumbeat of essentialist, deterministic, and negative language [about a particular race], they risk liability under federal law." *De Piero v. Pa. State Univ.*, 711 F. Supp. 3d 410, 424 (E.D. Pa. 2024). And when a municipal agency consistently ignores the racial harassment of employees in both trainings and workplace interactions, it can be held liable.

As previously noted, an actionable municipal policy can be based on municipal inaction. *See Cash*, 654 F.3d at 334; *see also City of Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied."). A municipal agency can be liable under *Monell* when a "consistent pattern of failing to adequately respond to [] complaints," *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009), can support an inference of "tacit authorization of the offensive acts," *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980). In particular,

we previously recognized that *Monell* liability may attach when harassment is pervasive, and the municipal entity fails to intervene. *See, e.g.*, *Lucente*, 980 F.3d at 297–98; *Matusick*, 757 F.3d at 63.

Here, Chislett's hostile work environment claim was based on "the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). She presented evidence of racial harassment that occurred repeatedly over the course of 2018 and 2019 in trainings and workplace interactions. Based on Chislett's evidence, a rational juror could find that such harassment was "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco*, 971 F.2d at 871.

Chislett must present evidence of "sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse." *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012). She made a sufficient showing to defeat Defendants' motion for summary judgment. There is evidence that, from Spring 2018 on, Chislett complained to supervisors and requested their help numerous times about the racialized workplace interactions and training sessions, and even

had legal counsel reach out on her behalf in 2019. She complained to individuals including her leadership coach and Senior Strategy and Policy Advisor Winkfield, OEA Senior Executive Director Ababio-Fernandez, Deputy Chancellor Robinson, and Senior Director of Operations Kazi Additionally, Ababio-Fernandez routinely collected "post-session surveys" and regularly met with her superior Deputy Chancellor Robinson after the implicit bias training sessions as "part of conversations upwards so that [her] boss or the chancellor was in the know of progress." App'x at 1435. Her superior then conveyed the findings to Carranza. It is a reasonable inference that complaints regarding the sessions were conveyed upward. At this stage of the litigation, we draw all reasonable inferences in Chislett's favor. *See Bey*, 999 F.3d at 164.

Despite Chislett reporting the racial harassment, at no point did her supervisors intervene. Her supervisors routinely dismissed the harassment and in one instance, prevented her from having a private meeting regarding her concerns. Far from curbing the harassment or disciplining the alleged abusers, Winkfield told Chislett it was her "responsibility to ask people to stay in protocol." App'x at 154. In short, construing the evidence most favorably to

41

Chislett, a rational jury could find that the administration condoned the racial harassment.

The district court held and Defendants argue on appeal that Chislett failed to raise a genuine dispute of material fact as to whether the purportedly hostile work environment was attributable to a DOE policy because (1) Carranza did not directly oversee the implicit bias trainings; (2) a number of the sessions were sponsored by individual DOE departments and therefore occurred outside the formal implicit bias training program; and (3) some of the statements were expressed by other employees or pertained to general workplace disagreements with Chislett. We reject these arguments. For Chislett to prevail, it is not necessary that Carranza have been directly involved in each step of the implicit bias trainings; rather, it is sufficient that he created or tolerated "a policy or custom under which unconstitutional practices occurred." *Back*, 365 F.3d at 127 (internal quotation marks omitted); *see also Herrera v. N.Y.C. Dep't of Educ.*, No. 1:21-CV-7555-MKV, 2024 WL 245960, at *14 (S.D.N.Y. Jan. 23, 2024) ("Plaintiffs are not required to show that Carranza personally demoted them, provided that Plaintiffs can show that 'a district employee' demoted them 'acting pursuant to'

an established policy or practice of racial discrimination." (quoting *Hurdle v. Bd. of Educ. of City of N.Y.*, 113 F. App'x 423, 424 (2d Cir. 2004) (summary order)).

Additionally, a reasonable juror could connect the racial hostility at the DOE to a municipal policy even if some of the comments occurred outside the formal implicit bias training program or were expressed by Chislett's colleagues in the context of workplace disagreements. First, as previously noted, the record established by Defendants is unclear as to which trainings were part of the formal implicit bias initiative, especially because the OEA was tasked with developing, scaling, and helping to lead the trainings. Second, Chislett presented evidence that racist sentiments spilled over from the trainings to other workplace interactions as DOE employees directed language from the trainings at her.

Chislett has created a genuine dispute of material fact about whether such "inaction and acquiescence to the harassment" enabled "the harassment to become the custom and practice, if not the policy, of the [DOE]." *Matusick*, 757 F.3d at 63.

Thus, Chislett has shown a genuine dispute of material fact on the question whether the alleged hostile work environment shown in her evidence

43

was attributable to a municipal policy. Accordingly, the district court erred in granting summary judgment to Defendants on Chislett's hostile work environment claim, and we vacate this part of the district court's ruling.

## III.   Plaintiff's Claim of Constructive Discharge

A constructive discharge can be supported by a showing of an aggravated case of a hostile work environment. *See Pa. State Police v. Suders*, 542 U.S. 129, 146 (2004). "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 185 (2d Cir. 2011) (emphasis added); *see also Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020) (requiring that the employer's actions be "deliberate[]"). The inquiry is whether "working conditions bec[a]me so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Suders*, 542 U.S. at 141. In this vein, the plaintiff's working conditions must be more than merely "difficult or unpleasant." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993). At bottom, the standard for establishing a constructive discharge "is higher than the standard for establishing a hostile

44

work environment." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010).

Chislett has not met the demanding standard for a constructive discharge claim. Without doubt, Chislett's evidence can support a rational jury finding that her working conditions had been abusive and unpleasant, but it did not show that the employer had intentionally created a workplace that would be so intolerable that she "would have felt compelled to resign" such that it would constitute a constructive discharge to her. *Suders*, 542 U.S. at 141.

Accordingly, we conclude that the district court properly granted summary judgment to Defendants on Chislett's constructive discharge claim.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Defendants is AFFIRMED as to Chislett's claims of demotion and constructive discharge, and VACATED as to Chislett's claim of hostile work environment. The matter is REMANDED for further proceedings.

45